*FILED*

**UNITED STATES DISTRICT COURT** 2013 MAY -1 PM 3: 14
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO. FLORIDA

In re Seizure of funds on deposit at
Ameriprise Group in accounts
072372469001, 16791187001, and
167911890001, at Pershing Investment
in account 3FB300824, at Morgan
Keegan/Raymond James in account
32772063, and at Capital One Bank in
account 8077989170

Timothy Hummel,

        Movant,

vs.                                            Case No. 8:12-mj-1457-T-37

United States of America,

        Respondent.

---

## ORDER

This cause is before the Court on the following:

1.    Movant Timothy Hummel's Motion for Return of Property (Doc. 2), filed
October 17, 2012;

2.    Notice of Filing Additional Affidavit in Support (Doc. 3), filed October 18,
2012;

3.    Notice of Filing Exhibit B to the Affidavit of Paul Doering (Doc. 4), filed
October 22, 2012;

4.    United States of America's Response in Opposition to Timothy Hummel's
Motion for Return of Property (Doc. 7), filed November 16, 2012;

5.    Supplemental Memorandum in Support of Motion for Return of Property
(Doc. 19), filed January 11, 2013;

6.      Memorandum of Amicus Curiae National Association of Criminal Defense Lawyers in Support of Movant (Doc. 22), filed January 14, 2013;[1]

7.      United States of America's Supplemental Response in Opposition to Defendant Fedida's Motion to Dismiss Pursuant to Fed. R. Crim. P. 12(b) and Hummel's Motion Seeking Return of Property Under Fed. R. Crim. P. 41(g) (Doc. 24), filed February 4, 2013;

8.      Movant's Motion to Strike (Doc. 25),[2] filed February 12, 2013;

9.      Movant's Notice of Supplemental Authority (Doc. 26), filed February 12, 2013;

10.     Unites States of America's Response in Opposition to Hummel's Motion to Strike (Doc. 27), filed February 27, 2013.

The Court held a hearing on the Motion for Return of Property on December 6, 2012. (Doc. 14.) At the hearing, the Court permitted the Movant, the Government, and the Defendant in a criminal proceeding in which a similar issue was raised to present argument and testimony as to whether the chemical substances at the heart of this matter are controlled substance analogues.

---

[1]  The Court hereby grants the Unopposed Motion of the National Association of Criminal Defense Lawyers for Leave to File Memorandum of Law as Amicus Curie (Doc. 21) and Counsel John Cline's Motion For Permission to Appear Pro Hac Vice (Doc. 20).

[2]  Hummel was given leave to supplement the record, if needed, and present additional arguments in support of his motion. (Doc. 17.) The Government was also granted leave to raise additional arguments in support of its position. (Id.) The parties submitted supplemental briefs and additional expert declarations pursuant to the Court's Order. Hummel contends that the Court did not grant the Government leave to submit additional evidence and the Court should therefore strike the Government's supplemental expert declarations. (Doc. 25.) Because the Government was correct in its interpretation of the Court's Order (and, in any event, because what is sauce for the goose is sauce for the gander), the Court finds that Hummel's Motion to Strike is due to be denied.

## BACKGROUND

The Government seized nearly $15 million in funds from four financial accounts nominally owned by the Movant, Timothy Hummel, pursuant to a warrant issued by a magistrate judge on July 25, 2012.[3] The warrant was issued in response to an application and affidavit submitted by an agent of the Drug Enforcement Agency. The Government has not initiated a criminal proceeding against Hummel, nor has it initiated criminal or civil forfeiture actions with regard to these funds.[4]

According to the information provided in the affidavit in support of the warrant, Hummel and his associates operate several businesses (the "enterprise") that manufacture and distribute "smokable synthetic cannabinoid products," which are commonly known as synthetic marijuana, incense, spice, and K2. (Doc. 2, Ex. 1 (hereafter "DEA Aff.") ¶¶ 4, 8.) At various times, the enterprise operated in Texas, Florida, Louisiana, and Arizona. (Id. ¶¶ 11–23.)

On April 11, 2012, agents conducted a voluntary inspection of a facility in Tampa, Florida, that they suspected served as a manufacturing site for the enterprise. (Id. ¶ 24.) Hummel was present during the inspection and identified himself as a manager of the facility. (Id.) During the inspection, the agents observed employees of the enterprise mix

---

[3] The Court assumes without deciding that Hummel has an interest in the funds sufficient to give him Article III standing. Cf. United States v. $38,000.00 in U.S. Currency, 816 F.2d 1538, 1543 (11th Cir. 1987) (discussing the standing requirement in the context of a forfeiture proceeding); United States v. Maez, 915 F.2d 1466, 1468 (10th Cir. 1990) ("'[T]he seizure of property from someone is prima facie evidence of that person's entitlement, particularly when the seized property is money.'" (quoting United States v. Estep, 760 F.2d 1060, 1064 (10th Cir. 1985))).

[4] The Government seized additional funds that are the subject of forfeiture proceedings. As to the funds at issue here, the parties have agreed that the Government may delay filing any such proceeding until the Court adjudicates Hummel's motion. (See Doc. 23.)

chemicals with a plant-like substance used in the manufacture of synthetic marijuana. (*Id.*) They observed the employees package the resulting product in branded wrappers. (*Id.*) They also located a large, locked refrigerator containing chemicals, some of which were labeled "UR-144." (*Id.*) The agents took samples during the inspection, and later laboratory tests indicated that the samples contained a substance that is known as XLR-11. (*Id.*) The agents returned to the facility three weeks after the inspection and found that it was abandoned. (*Id.*)

The enterprise advertised the availability of its synthetic marijuana products using various internet websites. (*Id.* ¶¶ 28–33.) One or more of the websites advertised the products as "sachet," "organic," or "aromatic" potpourri that is "not for human consumption," "analog free," and "DEA Compliant." (*Id.*) The websites also contained a list of "possible side effects" from ingesting the products. (*Id.*) The agents understood that, based on their experience in these matters, the products identified on the websites were sold in packaging and prices that were similar to the packaging and prices of marijuana that is sold to street-level consumers of that drug. (*Id.* ¶¶ 34–35.) The Government conducted controlled purchases of the products and, upon testing the products that were delivered, found that they contained XLR-11. (*Id.* ¶¶ 25–26.)

The affidavit in support of the warrant contends that UR-144 and XLR-11 are "controlled substance analogues." (*Id.* ¶ 24.) Federal law (known as the Analogue Act) prohibits the manufacture and sale of controlled substance analogues if they are intended for human consumption. (*Id.* ¶ 4 (citing 21 U.S.C. §§ 802, 813, 841).) The affidavit states that the DEA has determined that UR-144 and XLR-11 share substantial chemical structural similarities with a controlled substance known as JWH-18. (*See, e.g., Id.* at ¶¶ 24, 26, 31.) The affidavit identified, among other things, the seized funds

4

as proceeds traceable to the sale of the enterprises' products. (*Id.* ¶¶ 4–6, 11, 25, 36–60.) The Government seized the funds following issuance of the warrant.

Hummel moved for the return of the seized funds, arguing that the affidavit in support of the warrant is deficient in several respects. (Doc. 2.) The Government opposed Hummel's motion. (Doc. 7.)

## JURISDICTION

As the Government has initiated no criminal or forfeiture proceeding with regard to Hummel or these funds, the Court assumes it has power to grant the relief requested under its "equitable jurisdiction." *See In the Matter of the Search of William J. McCorkle*, 972 F. Supp. 1423, 1430–31 (M.D. Fla. 1997).[5]

## STANDARDS

Hummel's motion was made pursuant to Federal Rule of Criminal Procedure 41(g). That rule provides:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it provides that "no Warrants shall issue, but upon probable cause." U.S. Const.

---

[5] "Federal courts have developed the doctrine of 'equitable' or 'anomalous' jurisdiction to enable them to take jurisdiction over property in order to adjudicate actions for the return of unlawfully seized property even though no indictment has been returned and no criminal prosecution is yet in existence." *United States v. Chapman*, 559 F.2d 402, 406 (5th Cir. 1977); *see also United States v. Howell*, 425 F.3d 971, 974 (11th Cir. 2005).

amend. IV. Probable cause exists where there is a "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion—the same standard used to determine the legality of arrests, searches, and seizures in criminal law." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1440 (11th Cir. 1991) (en banc). The existence of probable cause is judged "not with clinical detachment, but with a common sense view to the realities of normal life." *United States v. A Single Family Residence*, 803 F.2d 625, 628 (11th Cir. 1986). The Government may use both circumstantial evidence and hearsay to establish probable cause. *Four Parcels of Real Property*, 941 F.2d at 1440. The magistrate judge who reviews the application for a warrant must consider the "totality-of-the-circumstances" and "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of the persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The task of a reviewing court in examining a challenge to a search warrant is different than that of an issuing judge considering whether to issue the warrant. *Id.* In determining whether a search warrant is supported by probable cause, a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant. *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984); *United States v. Miller*, 24 F.3d 1357, 1363 (11th Cir. 1994) ("[R]eviewing courts lend substantial deference to an issuing magistrate's probable cause determinations."). In reviewing the probable cause determination, supporting affidavits should not be interpreted in a hyper-technical manner; rather, a realistic and commonsense approach

6

should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrate judges in their probable cause determinations. *See Gates*, 462 U.S. at 236–37 (1983); *Miller*, 24 F.3d at 1361. When it is difficult to determine whether a search warrant affidavit supports probable cause, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Upton*, 466 U.S. at 734.

## ANALYSIS

Hummel contends that the magistrate judge's probable cause determination was erroneous because: (1) the affidavit does not allege or supply probable cause with regard to his state of mind—that is, the scienter requirement; and (2) the Analogue Act is unconstitutionally vague as applied to UR-144 and XLR-11.[6] The Court addresses Hummel's vagueness challenge first.

### I. Vagueness Challenge

Hummel contends that the Analogue Act does not provide constitutional notice that UR-144 and XLR-11 are controlled substance analogues of a substance known as JWH-18. The vagueness doctrine requires only that a statute define an offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *United States v. Fisher*, 289 F.3d 1329, 1333 (11th Cir. 2002). "Although the doctrine

---

[6] Hummel argued that UR-144 and XLR-11 are not controlled substance analogues in his original motion. At the hearing held in this matter and in his supplemental papers, Hummel modified his argument and took up the vagueness challenge asserted by the defendant in criminal case no. 6:12-cv-209-Orl-37DAB. The Court considers these arguments together when it discusses Hummel's vagueness challenge.

focuses both on actual notice to citizens and arbitrary enforcement, . . . the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

Vagueness challenges must be evaluated in the light of the facts of the case at hand. *Id.* Thus, the Court must apply the statutory definition of controlled substance analogue to UR-144 and XLR-11 to determine if ordinary people would be able to determine that those substances are proscribed analogues of JWH-18. *See id.* at 1336–37. If so, the Analogue Act is not unconstitutionally vague as applied to UR-144 and XLR-11. *See id.* This analysis requires the Court to interpret the statutory definition of "controlled substance analogue" which, as discussed below, is more problematic than it may first appear to be. The Court must then apply the statutory definition.

### A.  Statutory Interpretation

Prior to addressing Hummel's vagueness challenge, the Court must interpret the statute in question, starting with the plain language of the statute and the traditional tools of statutory construction. *See United States v. Veal*, 153 F.3d 1233, 1245 (11th Cir. 1998); *see also Shotz v. City of Plantation*, 344 F.3d 1161, 1167 (11th Cir. 2003). The Analogue Act provides:

> Except as provided  . . . , the term "controlled substance analogue" means a substance—
>
> (i)     the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>
> (ii)    which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect

on the central nervous system of a controlled substance in schedule I or II; or

(iii)    with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A). This definition contains three subparagraphs. The first subparagraph concerns the chemical structure of the putative analogue. The next two subparagraphs relate to the pharmacologic effect of a putative analogue or its intended pharmacologic effect. The conjunction *or* is used between the second and third subparagraphs.

There are two ways to interpret the relationship between subparagraph (i) and subparagraphs (ii) and (iii). The conjunction *or* is commonly used as a coordinating conjunction that joins grammatically equivalent elements. *See* William Strunk Jr. & E.B. White, *Elements of Style* 91 (4th ed. 2000). Thus, the definition can be interpreted in the disjunctive; that is, each subparagraph could be construed to define a category of substances that qualify as controlled substance analogues. Under this construction, a substance is a controlled substance analogue if the requirement of any one of the three subparagraphs is satisfied.

The conjunction *or* is also commonly used as a correlative conjunction to indicate a complementary grammatical relationship. *See id.*; *see also The American Heritage Dictionary* 299 (1973) (defining a correlative conjunction as one that indicates a "reciprocal or complementary grammatical relationship"). The definition therefore can also be interpreted in the conjunctive; that is, the *or* could connote a complementary relationship between the last two subparagraphs relating to the pharmacologic effects of

a putative analogue. Thus, the definition could be construed to mean that a substance must satisfy the requirements of subparagraph (i) *and* either subparagraph (ii) or (iii). The question of whether the definition of controlled substance analogue should be read in the disjunctive or conjunctive has not yet been answered in this Circuit. *See Fisher*, 289 F.3d at 1337–38 (expressly declining to answer that exact question).

The first subparagraph states a requirement regarding the chemical structure of a substance. Subparagraphs (ii) and (iii), on the other hand, both address the pharmacologic aspects of a substance and are plainly written in the alternative. There is no indication, however, whether Congress intended the statute to encompass substances that satisfy the requirements of subparagraphs (i) *and* (ii) or (iii), or substances that satisfy only the requirement of (i) or (ii) or (iii).[7]

The syntax of the definition offers no more assistance. Each subparagraph could be construed as a restrictive clause that imposes an independent definition of "substance" (which appears in the introductory clause of the definition just before the em dash). This construction would support a disjunctive reading.

One could also construe the subparagraphs as a whole. Under this reading, the three subparagraphs define a putative analogue by its the chemical structure (in subparagraph (i)) and its pharmacologic effects (in subparagraphs (ii) and (iii)). Under

---

[7] Indeed, the U.S. Courts of Appeals that have discussed the definition of controlled substance analogue have reached different conclusions on this issue. In *Fisher*, the Eleventh Circuit remarked in *dicta* that a "plain reading of the statute would indicate that the definition should be read in the alternative." 289 F.3d at 1338. The Third Circuit, on the other hand, thought the "definition of a controlled substance analogue reads more naturally in the conjunctive." *United States v. Hodge*, 321 F.3d 429, 436 (3d Cir. 2003). Because the *Fisher* court found it unnecessary to address this issue for it to reach its holding, it did not conduct an in depth analysis of the statute. Having rather closely scrutinized the statutory definition, this Court concludes that the *Fisher* court's reading of the statute is strained rather than plain.

this construction, the final two subparagraphs (each beginning its substantive requirement with "which") are subordinate to the requirement of the first subparagraph. That is, the final subparagraphs read in parallel, referring to and modifying the substance whose chemical structure is defined in subparagraph (i). This construction would support a conjunctive reading.

The traditional tools of construction likewise do not help to interpret the statutory definition. See United States v. Hodge, 321 F.3d 429, 436 (3d Cir. 2003). In Hodge, the Third Circuit reasoned that the doctrine of the last antecedent suggested that the last two subparagraphs modified the phrase "controlled substance in schedule I or II" in the first subparagraph, rather than the word "substance" in the introductory portion of the definition. See id. at 436. This reading is not satisfactory, however. If the two subparagraphs refer to the "controlled substance in schedule I or II" in the first subparagraph, then the requirements of those subparagraphs—both of which require a comparison between putative analogue and a "controlled substance in schedule I or II"—would be meaningless. The doctrine of the last antecedent is also of no moment because, as discussed above, the syntax of the statutory definition does not favor either interpretation. Accordingly, the Court concludes that the Analogue Act's definition of a controlled substance analogue is ambiguous.

The Court turns next to the statute's legislative history. See Veal, 153 F.3d at 1245 (noting that review of legislative history is unnecessary unless a statute is "inescapably ambiguous"). Senator Strom Thurmond introduced the Senate bill that would become the Analogue Act. See 131 Cong. Rec. 19,411. The bill was intended to make illegal "chemical substances—so called 'designer drugs'—which are not currently covered by the Controlled Substances Act." Id. Its purpose was to "prevent underground

chemists from producing dangerous designer drugs by slightly changing the chemical composition of existing illegal drugs." *Id.* In the House, Representative Dan Lungren, the bill's sponsor, remarked that the intent of the bill was to close a loophole in the federal drug laws—"the time lag between the production of these new designer drugs and their subsequent control under the Controlled Substances Act." 131 Cong. Rec. 18,938; *see also* 131 Cong. Rec. 19,114–15 (statement of Sen. Hawkins) ("[A]s we have discovered, as fast as the Government outlaws designer drugs, the chemists can synthesize new ones."); 131 Cong. Rec. 27,311 (statement of Sen. D'Amato) (noting that the bill "closes the loophole in present law that allows the creation and distribution of deadly new drugs without violating Federal law").

Congress intended to close this loophole by using a method of identifying banned substances that was different from the method employed by the Controlled Substances Act. As noted by Senator Alfonse D'Amato, the "problem with the [Controlled Substances Act] is that it defines illegal drugs by referring to their exact chemical formulas." 131 Cong. Rec. 27,311. The proposed legislation did not focus on the "drugs themselves," nor did it "set up a regulatory or administrative framework." 131 Cong. Rec. 32,950 (statement of Rep. Lungren). Rather, Congress intended to make illegal substances that satisfied the definition of controlled substance analogue. 131 Cong. Rec. 19,114 (stating that the bill prohibits the manufacture, distribution, and possession of designer drugs and "specifically defines designer drugs to cover those substantially similar to existing controlled substances"); *see also* 131 Cong. Rec. 18,938 (statement of Rep. Lungren) (same); 131 Cong. Rec. 37,525 (statement of Sen. Thurmond) (explaining that the Senate Judiciary Committee amended the proposed legislation by substituting the term "controlled substance analog" for the term "designer drug"). Thus,

12

the legislative debate concerning the definition of controlled substance analogue is critical to appreciate the meaning and scope of the statute.

The original Senate bill defined a controlled substance analogue as a substance that had a chemical structure substantially similar to a controlled substance in schedule I or II *or* one that was specifically designed to produce an effect substantially similar to a controlled substance in schedule I or II. 131 Cong. Rec. 19,114. This definition appears to support the disjunctive reading of the enacted statute. The House, on the other hand, defined a controlled substance analogue in its bill as a substance

> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; *and*
> (ii)(I) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system; *or*
> (II) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system.

132 Cong. Rec. H6628 (daily ed. Sept. 11, 1986). This definition appears to support a conjunctive reading of the enacted statute.

When the bill passed by the House was taken up by the Senate, that body amended the bill by replacing the House's definition of controlled substance analogue with the definition used in the original Senate bill. 132 Cong. Rec. 13,652–53. The House then switched the definition back to its version when it took up the Senate's amendments, 132 Cong. Rec. H9485–86 (daily ed. Oct. 8, 1986), and the Senate switched it back again when it considered the House's changes to its amendments, 132 Cong. Rec. S15,946 (daily ed. Oct. 10, 1986).

There was no meaningful debate in either the House or the Senate on these changes. Moreover, the version of the definition ultimately enacted did not appear in the legislative record until the final version of the bill, and it was not debated on the floor of

13

either chamber. The legislative history (such that it is) therefore could support either interpretation of the statute and does not dispositively support either. *See United States v. Vickery*, 199 F. Supp. 2d 1363, 1368–69 (N.D. Ga. 2002).

Thus, even after resorting to the standard tools of statutory construction and considering the legislative history, the Court concludes that 21 U.S.C. § 802(32)(A) is ambiguous. In such cases, the Eleventh Circuit has directed courts to apply the rule of leniency to construe criminal statutes in favor of the defendant. *See United States v. Cruz*, 805 F.2d 1464, 1473–74 (11th Cir. 1986). Because a disjunctive reading of the statutory definition of controlled substance analogue could lead to the criminalization of common substances that are found in nearly every pantry in America, the application of the rule of leniency requires the Court to read the definition of controlled substance analogue in the conjunctive. *See United States v. Turcotte*, 405 F.3d 515 (7th Cir. 2005); *United States v. Klecker*, 348 F.3d 69 (4th Cir. 2003); *United States v. Washam*, 312 F.3d 926 (8th Cir. 2002).

## B. Statutory Application

The Court will consider first whether UR-144 and XLR-11 are substantially similarity to JWH-18, as required by subparagraph (i) of the statutory definition. The Court will then discuss whether UR-144 and XLR-11 satisfy the requirements of subparagraphs (ii) or (ii) of the statutory definition.

### 1. Substantially Similar Chemical Structure

Subparagraph (i) of the definition of controlled substance analogue is satisfied if a substance's chemical structure is substantially similar to the chemical structure of a controlled substance in schedule I or II. Here, the Government contends that the chemical structures of UR-144 and XLR-11 are substantially similar to the chemical

structure of JWH-18. The Government reaches this conclusion based on an analysis of the two-dimensional structures of these compounds, which are as follows:



| UR-144 | XLR-11 | JWH-18 |

(*See United States v. Fedida*, No. 6:12-cr-209-Orl-37DAB, Doc. 33-1; Doc. 37-2, Boos Decl. ¶¶ 9, 19.) As described by the Government's expert, each of these substances has an indole core, which consists of a benzene ring fused to a nitrogen-containing pyrrole ring. (Boos Decl. ¶¶ 8, 17.) Each substance also has two substitutions to the indole core. The first substitution takes place at the nitrogen in the indole core, which is also referred to as the "1-position." In all three substances, the substitution at the 1-position is a 5-carbon pentyl chain.[8] The second substitution is located at a carbon atom in the indole core which is located two positions away counterclockwise from the nitrogen. This is referred to as the "3-position."

UR-144, XLR-11, and JWH-18 differ primarily with regard to the functional group

---

[8] In XLR-11, the pentyl chain is capped with a fluorine atom, the presence of which is not material to the Court's analysis, either legally or as a matter of fact. *See, e.g.*, 131 Cong. Rec. 19,115 ("By adding a fluoride or an extra carbon molecule, a new drug is created which will produce the high or euphoria the user seeks but is not illegal.").

that occupies the 3-position of the indole core. The 3-position substituent in JWH-18 is a naphthyl moiety, which is a fused pair of benzene rings, attached to the indole core by a carbonyl group. The 3-position substituents in UR-144 and XLR-11, however, are tetramethylcyclopropyl moieties, which consist (in part) of three carbon atoms that are linked together in a triangular ring, that are also attached to the indole core by a carbonyl group. Thus, UR-144, XLR-11 (except as noted elsewhere), and JWH-18 share the following chemical structure:



(*Id.* ¶¶ 12, 21.) The R in the figure represents either naphthyl or tetramethylcyclopropyl, depending upon the substance.

The Government contends that the replacement of the naphthyl moiety in JWH-18 with the tetramethylcyclopropyl moiety present in UR-144 and XLR-11 is of minor significance. (*See id.* ¶¶ 14, 23.) As such, the Government and its experts conclude that the chemical structures of UR-144 and XLR-11 are substantially similar to the chemical structure of JWH-18. (*Id.* ¶¶ 24–26.)

Hummel proffers the opinions of no less than five expert witnesses in opposition. (Doc. 2, pp. 15–16.) These experts opine that the chemical structures of UR-144 and XLR-11 are nor substantially similar to the chemical structure of JWH-18 for a variety of

reasons. (*Id.*) The experts criticize the Government's reliance on two-dimensional models of the substances' chemical structures. (*Id.*) The preferred approach, according to Hummel's experts, is to analyze the substances using three-dimensional models. (*Id.*)

The Court recognizes that there appears to be a principled disagreement among the experts as to whether the chemical structures of UR-144 and XLR-11 are substantially similar to JWH-18's chemical structure. The differing opinions of experts on the issue of substantial similarity does not, however, render the Analogue Act vague. *See, e.g., United States v. Brown*, 279 F. Supp. 2d 1238, 1241–42 (S.D. Ala. 2003). On the issue of vagueness, the Government need not overcome the critical eye of chemists and other experts. Rather, it must merely show that ordinary people would be able to determine whether UR-144 and XLR-11 are proscribed analogues of JWH-18. *See United States v. Carlson*, 87 F.3d 440, 443–44 (11th Cir. 1996); *see also Brown*, 279 F. Supp. 2d at 1241.[9] The substances at issue in this case share the same core chemical structure with JWH-18. The only meaningful difference between these compounds is a

---

[9] The Court declines Hummel's invitation to make a finding that the chemical structures of UR-144 and XLR-11 are not substantially similar to the chemical structure of JWH-18. This matter is not a forfeiture proceeding, and it is clear the funds will be subject to a forfeiture proceeding in the future or returned. Thus, Hummel will be given an opportunity to present his arguments to a finder of fact at the proper time and in the proper manner.

In this matter the Court has been asked to determine whether there is substantial evidence in the record in support of the magistrate judge's decision to issue the warrant. The affidavit in support of the warrant contends that UR-144 and XLR-11 are "controlled substance analogues." (*Id.* ¶ 24.) The affidavit also states that the DEA has determined that UR-144 and XLR-11 share "substantial chemical structural similarities with a controlled substance known as JWH-18. (*See, e.g., Id.* at ¶¶ 24, 26, 31.) Such statements form a sufficient basis for a magistrate judge's probable cause determination. *See O'Ferrel v. United States*, 253 F.3d 1257, 1267–68 (11th Cir. 2001) (describing, in the context of a *Franks* challenge, a warrant that was supported by an affidavit which stated the FBI laboratory had determined that two sets of documents were prepared by the same typewriter); *see also United States v. Rabe*, 848 F.2d 994, 997 (9th Cir. 1988) (noting that "the magistrate [judge] may consider expert opinion" when making his probable cause determination).

replacement found within the 3-position substituent. A reasonable layperson who examines the two-dimensional drawings of the chemical structures of UR-144, XLR-11, and JWH-18 could plausibly conclude that such substances are substantially similar. This is all that is required.

### 2. Substantially Similar Pharmacologic Effects

The statutory definition sets forth alternative requirements concerning the pharmacologic effects of a putative controlled substance analogue. Subparagraph (ii) prohibits putative analogues that have an effect that is substantially similar to a controlled substance. Subparagraph (iii) prohibits putative analogues that are intended or represented to have an effect substantially similar to a controlled substance. The third subparagraph is relevant in this case.

The affidavit in support of the issuance of the warrant in this case contains sufficient information for the magistrate judge to have concluded that Hummel and the enterprise represented or intended their products to have the same pharmacologic effects as cannabinoid compounds that are controlled substances. The internet websites used by the enterprise advertised the products as "DEA compliant," "analog free," and "not for human consumption," but then go on to list numerous effects from the ingestion of the products. (DEA Aff. ¶¶ 28–33.) The products contained plant material that the agents knew was used to make synthetic marijuana, and they were packaged and sold in manner that was consistent with the way marijuana is sold to street-level consumers. (*Id.* ¶¶ 24, 34–35.) Furthermore, Hummel and his associates moved the enterprise to Florida from Texas when that state enacted legislation criminalizing some of the chemical substances used in the enterprise's synthetic marijuana products, evincing that the enterprise has a sophisticated understanding of chemical substances

18

and the laws that regulate such substances. (*Id.* ¶ 27.) From this and the other information supplied in the affidavit, one could infer that Hummel and the enterprise were selling products containing substances that they held out as having a pharmacologic effect that was substantially similar to that of banned substances, such as JWH-18, when used by humans.[10]

\* \* \* \* \*

Accordingly, in view of the above, the Court concludes that the Analogue Act is not unconstitutionally vague as applied to UR-144 and XLR-11.

## II.  State Of Mind

Hummel also contends that the funds should be returned because the affidavit in support of the warrant application lacks evidence that he possessed the mental state necessary to violate federal law. (Doc. 2, pp. 11–13.) Hummel argues that the Government must show that he knew that the substances at issue meet the statutory definition of controlled substance analogue. (Doc. 19, pp. 5–6.) The Government does not contest Hummel's basic proposition, arguing instead that the affidavit supplies sufficient evidence for the magistrate judge's probable cause interpretation. (Doc. 24, pp. 18–21.) To address these arguments, the Court will discuss first whether the Analogue Act has a scienter requirement and, if so, the sufficiency of the affidavit submitted in support of the warrant.

---

[10] Because the requirement of the third subparagraph of the definition of controlled substance analogue is satisfied, the magistrate judge did not err when he made a determination that probable cause existed. Furthermore, this Court need not address the question of whether UR-144 and XLR-11 have a pharmacologic effect that meets the requirements of the second subparagraph, and the motions directed at the requirement of the second subparagraph are moot.

## A. Scienter Requirement

Hummel contends that Government must show that he knew that the substances at issue meet the statutory definition of controlled substance analogue. (Doc. 19, pp. 5–6.) The Eleventh Circuit has not spoken on this issue, and Hummel relies on an opinion from the Seventh Circuit, *United States v. Turcotte*, 405 F.3d 515 (7th Cir. 2005). In that case, the defendant was charged and convicted of violating the Analogue Act. *Id.* at 520. On appeal, the Seventh Circuit addressed a challenge to the trial court's jury instruction on scienter, which informed the jury that it did not need to find that the defendant knew the substance he possessed was a prohibited controlled substance. *Id.* at 524–30. The appellate court found this instruction to be incomplete at best and misleading at worst. *Id.* at 529.

The court explained that, because the Analogue Act imposes criminal liability through the more general provisions of the Controlled Substances Act ("CSA"), that statute's well-established scienter requirement was implicated. *Id.* at 525. Under the general provisions of the CSA, the Government must show that a defendant knows the substance in question is a controlled substance. *Id.* For cases involving *per se* illegal drugs, like cocaine, marijuana, and heroin, evidence of a defendant's knowledge of the specific substance involved implies that the defendant also knew that the substance is a controlled substance. *Id.* at 525–26. The Seventh Circuit noted, however, that cases involving "newly engineered and relatively unknown substances" are different than cases involving *per se* illegal drugs because "knowledge of the substance's identity does not automatically imply knowledge of its status as a controlled substance." *Id.* at 526. Thus, the more general scienter requirement of the CSA—a showing "that the defendants knew that they possessed a controlled substance"—does not work when a

20

defendant is charged with violating the provisions of the Analogue Act. *Id.* The court also noted that because controlled substance analogues are not, by definition, controlled substances, any such implication would be nonsensical. *Id.*

The Seventh Circuit therefore concluded that violations of the Analogue Act require "a showing that the defendant knew the substance in question was a controlled substance analogue." *Id.* at 527. In other words, the court held that, in order to satisfy the scienter requirement, the defendant must know that the substance in question meets the definition of a controlled substance analogue. *Id.* To do so, a defendant must know that the substance at issue has a chemical structure substantially similar to that of a controlled substance, and he or she must either know that it has similar pharmacologic effects or intend or represent that it has such effects. *Id.*

This Court is persuaded by the reasoning of the Seventh Circuit. The general enforcement provision of the CSA supplies a knowing scienter requirement, *see, e.g., United States v. Tobin*, 676 F.3d 1264, 1279–80 (11th Cir. 2012), and the statutory definition of controlled substance analogue provides certain essential elements to the crime, *see* 21 U.S.C. § 802(32)(A). As the Eleventh Circuit noted recently in a different context, "there is a general presumption that a knowing *mens rea* applies to every element in a statute." *United States v. Daniels*, 685 F.3d 1237, 1248–49 (11th Cir. 2012). Applying these general precepts, the Court concludes, like the Seventh Circuit, that when charging a violation of the Analogue Act the Government must show that the defendant knew the substance(s) in question satisfy the statutory definition of controlled substance analogue.

### B. Sufficiency Of The Affidavit

Turning to the affidavit in this case, the Court must only to determine whether

there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant. *Miller*, 24 F.3d at 1363. The affidavit states that Hummel was the registered owner of a business enterprise that sold synthetic marijuana using the internet. (DEA Aff. ¶¶ 11–19, 24, 27.) The enterprise's internet websites advertised the products as "DEA compliant," "analog free," "not for human consumption," and advise of numerous effects from the ingestion of the products. (*Id.* ¶¶ 28–33.) The products were packaged and sold in a manner similar to the way marijuana is distributed. (*Id.* ¶ 34.)

The affidavit also states that Hummel identified himself as the manager of a facility that was inspected by agents. (*Id.* ¶ 24.) While at the facility, the agents observed labeled chemicals in a locked refrigerator, as well as Hummel's employees preparing and packaging synthetic marijuana for sale. (*Id.*) After the inspection, the enterprise began to unwind the operation, close its financial accounts, and move. (*Id.* ¶¶ 11–12, 24, 27–28.) Hummel fled to Arizona, just as he had done when Texas banned substances used in some of the enterprise's products. (*Id.*)

From these and the additional allegations contained in the affidavit, the magistrate judge could reasonably infer that Hummel and the enterprise knew that the chemical structures of the substances used in the enterprise's products were substantially similar to the chemical structures of controlled substances. The allegations also provide more than a sufficient evidence that Hummel and the enterprise intended or represented that the substances in their products had pharmacologic effects substantially similar to that of a controlled substance.

\* \* \* \* \*

Accordingly, in view of the above, the Court concludes that there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant.

## CONCLUSION

Accordingly, it is hereby **ORDERED and ADJUDGED**:

1.      Hummel's Motion for Return of Property (Doc. 2) is **DENIED**.

2.      Unopposed Motion of the National Association of Criminal Defense Lawyers for Leave to File Memorandum of Law as Amicus Curie (Doc. 21) is **GRANTED**.

3.      Motion For Permission to Appear Pro Hac Vice (Doc. 20) is **GRANTED**.

4.      Movant's Motion to Strike (Doc. 25) is **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers in Tampa, Florida, on April 30, 2013.

ROY B. DALTON, JR.
UNITED STATES DISTRICT JUDGE

Copies:

Counsel of Record